IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARIGNA TECHNOLOY LIMITED, an Irish corporation,<br><br>                 Plaintiff,<br><br>                 v.<br><br>LONGFORD CAPITAL FUND III, LP, a Delaware Limited Partnership,<br><br>                 Defendant. | C.A. No. 23-1441-GBW |

## MEMORANDUM ORDER

Pending before the Court is Defendant Longford Capital Fund III, LP's ("Longford" or "Defendant") Motion to Compel Arbitration (D.I. 17), and Plaintiff Arigna Technology Limited's ("Arigna" or "Plaintiff") Motion to Enjoin Arbitration (D.I. 21). Having reviewed the motions and all relevant briefing, the Court GRANTS Defendant's Motion to Compel Arbitration and DENIES Plaintiff's Motion to Enjoin Arbitration as moot. Accordingly, this matter is stayed pending resolution of the question of arbitrability by an arbitrator.

### I. INTRODUCTION

    a. **The Engagement Agreement and Funding Agreement**

In August 2020, Plaintiff engaged Susman Godfrey L.L.P. ("Susman"), a law firm specializing in litigation, to enforce Plaintiff's intellectual property against various entities. D.I. 2, ¶ 7; D.I. 4, Ex. A ("EA"). The agreement between Plaintiff and Susman, dated August 24, 2020, (hereinafter, the "Engagement Agreement"), defined the attorney-client relationship between the parties and outlined several patent enforcement campaigns Susman would pursue on Plaintiff's behalf. EA at 1. Pursuant to the Engagement Agreement, the parties agreed to

1

arbitrate "[a]ny dispute arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement—including any claim of legal malpractice, breach of fiduciary duty or similar claim and any claim involving fees or expenses." *Id.* at 15-16. The Engagement Agreement required that such disputes "be resolved by final and binding arbitration conducted in Houston, Texas, administered by and in accordance with the then-existing JAMS Comprehensive Arbitration Rules and Procedures." *Id.*

To fund Plaintiff's enforcement campaigns, the Engagement Agreement explained that fees and costs associated with the enforcement campaigns would be funded by Defendant, pursuant to a funding agreement executed between Susman and Defendant (hereinafter, the "Funding Agreement"). *Id.* at 7 ("You understand that [Defendant] is paying certain costs and expenses pursuant to a funding agreement that is attached to this engagement agreement."). The Funding Agreement between Susman and Defendant was executed on the same day Plaintiff entered the Engagement Agreement with Susman. D.I. 22 at 9. Further, each agreement included a copy of the other as an attached exhibit. *See* EA at 18 (noting that Funding Agreement is "attached as Exhibit G"); D.I. 4, Ex. B ("FA") at 1(noting that "Engagement Agreement . . . attached as Exhibit B").

Unlike the Engagement Agreement, which is governed by Texas law, the Funding Agreement is governed by the laws of the State of Illinois. FA, ¶ 9.1. Additionally, the Funding Agreement includes an arbitration provision requiring:

> Any Dispute arising out of or relating to this Agreement, including the breach, termination, enforcement, interpretation or validity thereof, or the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Chicago, Illinois, before a panel of three arbitrators. The arbitration shall be administered using the arbitration rules of the American Arbitration Association current at the time the

2

>Dispute is brought, which rules are deemed to be incorporated herein by reference.

*Id.*, ¶ 9.3.

### b. The Settlement

Pursuant to the terms of the Engagement Agreement, Plaintiff agreed that Defendant would be entitled to a portion of all settlement "Proceeds," in exchange for paying the up-front cost and expenses of Plaintiff's enforcement campaigns. EA at 3 ("As set forth in the Funding Agreement, to the extent actually incurred, such costs, expenses, and fees will be reimbursed by you to LCF from the Proceeds as set forth below in **Section (a)** and **Section (b)** below.") (emphasis in original). Additionally, the Engagement Agreement granted Defendant a lien over any "Proceeds" to secure Defendants right to some of the funds pursuant to the terms of the Engagement and Funding Agreements. *Id.* at 9. On August 28, 2020, Defendant filed a UCC Financing Statement with the Washington, D.C. Recorder of Deeds to perfect its first-priority security in the Proceeds. D.I. 2, ¶ 12.

On November 18, 2023, Plaintiff, represented by Susman, entered into a Settlement and License Agreement against an entity that Plaintiff claimed infringed certain of Plaintiff's patents. *Id.*, ¶ 14. Pursuant to the Settlement License Agreement, Plaintiff received a $100 million payment, which was made to Plaintiff's affiliate, Atlantic IP Services Ltd. ("Atlantic"), on December 15, 2023. Defendant maintains that it is entitled to $32 million from the $100 million settlement, which Plaintiff has thus far refused to pay. D.I. 18 at 2. According to Plaintiff, Defendant is entitled only to a portion of Plaintiff's payment to Susman, and Plaintiff maintains that no agreement entitled Defendant to any claims over the entire $100 million settlement. D.I. 22 at 5-6.

3

To resolve the parties' dispute over Defendant's entitlement to payment, Plaintiff filed the present action on January 9, 2024, seeking a declaration from the Court that Longford's UCC-1 extends only to Proceeds received by Susman. D.I. 2. Defendant responded by filing an arbitration demand before JAMS in Houston, Texas, against Plaintiff and Susman. D.I. 18, Ex. 1. Defendant now moves to compel arbitration "to resolve any disputes" between the parties. D.I. 18 at 1-2. Plaintiff opposes Defendant's motion and seeks an order from the Court to enjoin Defendant's arbitration. D.I. 22.

## II. LEGAL ANALYSIS

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., "creates a body of federal substantive law establishing and governing the duty to agreements to arbitrate disputes." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513, 522 (3d Cir. 2009). Pursuant to the Federal Arbitration Act, 9 U.S.C.A. § 2, "[a] written provision in any ... contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2 (West 2008). "A valid agreement to arbitrate applies to any claims unless it is certain 'that [the] arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *I.D.E.A. Corp. v. WC & R Ints., Inc.*, 545 F. Supp. 2d 600, 605 (W.D. Tex. 2008) (internal citations omitted).

Because "arbitration is a matter of contract," parties may agree to arbitrate on the issue of arbitrability. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69, 130 S. Ct. 2772, 2777, 177 L. Ed. 2d 403 (2010). Specifically, "parties may agree to have an arbitrator decide not only the merits

4

of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529, 202 L.Ed.2d 480 (2019). To determine whether parties to an arbitration agreement have agreed to arbitrate on the question of arbitrability, courts look to state law. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924, 131 L. Ed. 2d 985 (1995). If the Court, applying state law, finds clear and unmistakable evidence that "the parties have contractually agreed to delegate arbitrability disputes to the arbitrator," the Court must enforce that agreement just as they must enforce an agreement to delegate resolution of the underlying merits to the arbitrator." *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 702 (Tex. 2023), *reh'g denied* (June 9, 2023).

"[B]oth federal and [] state jurisprudence dictate that any doubt as to whether a controversy is arbitrable should be resolved in favor of arbitration." *McKee v. Home Buyers Warranty Corp.*, 45 F.3d 981, 985 (5th Cir. 1995). However, a heightened standard applies to the Court's analysis of whether contracting parties agreed to assign the issue of arbitrability to the arbitrator, and "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 70, 130 S. Ct. 2772 (2010) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920 (1995)).

5

## III. DISCUSSION

### a. The Engagement Agreement Delegates the Issue of Arbitrability to the Arbitrator.

#### 1. *The Engagement Agreement assigned arbitrability disputes to the arbitrator.*

The Engagement Agreement executed between Plaintiff and Susman holds that "[a]ny dispute arising out, in connection with, or in relation to the interpretation, performance or breach of this Agreement," including "any claim involving fees or expenses—shall be resolved by final and binding arbitration conducted in Houston, Texas . . . ." EA at 15-16. While Defendant contends that some or all of Plaintiff's claims fall within the scope of the Engagement Agreement's arbitration clause, the Engagement Agreement assigns "[t]he arbitrator, and not any court, [] the exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this Agreement and its arbitration clause." *Id.* Therefore, Plaintiff and Susman, by executing the Engagement Agreement, clearly and unmistakenly delegated the resolution of any arbitrability disputes arising between them to an arbitrator. *Id.*

Still, a question remains as to Defendant's right to enforce the arbitration provision given that, as Plaintiff notes, Defendant is not a signatory to the Engagement Agreement. D.I. 22 at 11. Defendant's non-signatory status does not necessarily preclude Defendant from enforcing the Engagement Agreement's arbitration clause, and courts have recognized that, in some instances, "it is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003) (internal citations omitted). However, "gateway dispute[s] about whether the parties are bound by a given arbitration clause raises a question . . . for a court to decide." *See Howsam v. Dean*

6

*Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). As Plaintiff notes, for a non-signatory to enforce an arbitration agreement, the non-signatory must "prove the existence of a valid agreement to arbitrate." D.I. 22 at 11.

Where a non-signatory seeks to assert an arbitration agreement, courts applying Texas law employ a two-step analysis to "'determine[ ] whether a valid arbitration agreement exists.'" *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398 (5th Cir. 2022) (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019)). Under the first step, courts review "'the terms of the agreement,' which 'dictate [w]ho is actually bound by an arbitration agreement.'" *Id.* If the terms of the relevant agreement are unclear, the Court then moves on to step two and "look[s] to theories such as equitable estoppel to determine whether a nonsignatory may compel arbitration." *Id.* (internal citations omitted). Here, the Engagement Agreement includes a broad dispute resolution clause, requiring "[a]ny dispute arising out of, in connection with, or in relation to the interpretation, performance, or breach of this Agreement" to be "resolved by final and binding arbitration . . . ." EA at 15-16. The clause itself does not limit arbitration to Plaintiff and Susman, the two signatories of the Engagement Agreement, nor does the clause hold that claims against or involving Defendant fall within its scope. *See id.* As such, the terms of the clause do not dictate who is bound, and the Court's analysis must continue to step two.

Under the second step, "[c]ourts addressing whether a non-signatory can enforce an arbitration agreement are guided by 'traditional principles' of state law,' which 'allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 531

(5th Cir. 2019) (citing *Arthur Andersen*, 556 U.S. at 631, 129 S.Ct. 1896). The Court finds that Defendant has carried its burden under at least two traditional, state-law theories: (1) incorporation by reference; and (2) third-party beneficiary theories.

> *2. The Engagement Agreement incorporates the terms of the Funding Agreement by reference.*

"By signing an agreement, a party provides 'strong evidence' that the party unconditionally assented to the agreement's terms, . . . and the party is presumed to have read and understood the agreement's contents and effect, including documents specifically incorporated by reference." *Taggatz v. Midland Credit Mgmt.*, No. SA-18-CV-169-XR, 2018 WL 11430810, at *3 (W.D. Tex. Nov. 27, 2018) (internal citations omitted). According to Defendant, Plaintiff manifested its assent to arbitrate with both Susman and Defendant by "signing the Engagement Agreement" because "the provisions of both [the Engagement Agreement and Funding Agreement] are part of the contract to which Arigna agreed." D.I. 18 at 11. For the following reasons, the Court agrees.

Under Texas law, "instruments pertaining to the same transaction may be read together to ascertain the parties' intent," and "in appropriate instances, courts may construe all the documents as if they were part of a single unified instrument." *Fort Worth Indep. Sch. Dist. v. Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). Specifically, the doctrine of incorporation by reference holds that a single agreement may be formed where "an unsigned paper [is] [] incorporated by reference in [a] paper signed." *Valero Mktg. & Supply Co. v. Baldwin Contracting Co.*, No. CIVA H-09-2957, 2010 WL 1068105, at *4 (S.D. Tex. Mar. 19, 2010) (citing *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex.2004)). In determining whether an agreement is incorporated by reference, "[t]he language used is not important

8

provided the document signed ... plainly refers to another writing." *Id.* However, "[p]lainly referring to a document requires more than merely mentioning the document" as "[t]he language in the signed document must show the parties intended for the other document to become part of the agreement." *Sunbelt Sec., Inc. v. Mandell*, No. 01-21-00209-CV, 2023 WL 1112514, at *11 (Tex. App. Jan. 31, 2023).

Plaintiff contends that the Engagement Agreement and Funding Agreement cannot be read as a single instrument because the agreements each contain arbitration clauses that are "governed by different law (Texas; Illinois)" and "select different dispute resolution procedures before different tribunals in divergent fora (JAMS arbitration in Houston; AAA arbitration in Chicago)." D.I. 22 at 9-10. These differences, according to Plaintiff, confirm that the parties intended for "each agreement [to] stand[] alone." *Id.* Having viewed the Engagement Agreement as a whole, the Court disagrees and finds overwhelming evidence that the parties intended for the two agreements to be read as a unified instrument.

Indeed, while Plaintiff alleges that the Engagement Agreement and Funding Agreement were executed for wholly distinct purposes—the former "to obtain legal representation" and the latter "to fund litigation"—the evidence shows that both agreements were executed as part of the same transaction: Plaintiff's patent enforcement campaigns. *See id.* As Plaintiff concedes, both agreements were executed on the same day, with each attached as an exhibit to the other. *Id.* at 9. In similar cases, courts have found that written attachments to an agreement "become part" of the agreement. *See Castroville Airport, Inc. v. City of Castroville*, 974 S.W.2d 207, 211–12 (Tex. App. 1998).

9

Here, it is clear that Plaintiff and Susman intended for the Funding Agreement to become part of the Engagement Agreement, not only because the two agreements are attached, but also because the Engagement Agreement itself is "replete with references to the Funding Agreement." D.I. 18 at 11; *see also Sunbelt Sec., Inc. v. Mandell*, No. 01-21-00209-CV, 2023 WL 1112514, at *11 (Tex. App. Jan. 31, 2023) (recognizing that documents are incorporated by reference when they are explicitly "referenced by name"). Indeed, the Engagement Agreement affixes and conditions Plaintiff's obligations to pay Defendant and Susman with Defendant's obligations under the Funding Agreement. Specifically, the Engagement Agreement notes that Defendant "agreed to pay certain [litigation] costs, expenses, and attorney's fees," which would be reimbursed by Plaintiff to Defendant once litigation concludes. EA at 3 ("[T]o the extent actually incurred, such costs, expenses, and fees will be reimbursed **by you to LCF** from the Proceeds as set forth below") (emphasis added). In describing Plaintiff's obligation to reimburse Defendant, the Engagement Agreement directs Plaintiff to review the costs and expenses **"set forth in the Funding Agreement."** *Id.* (emphasis added).[1]

Finally, as part of the Engagement Agreement, the parties included a "Client Acknowledgement" pursuant to which Plaintiff agreed that it:

> consulted [] independent counsel, concerning the negotiation of this Agreement and its terms (including the section on Dispute Resolution and Consent to Adverse Representation) *and the Funding Agreement attached as Exhibit G*, . . . that [Plaintiff] made sufficient investigation and inquiry to determine that this Agreement *and the Funding Agreement are fair and*

---

[1] And, while Plaintiff claims that the agreements "contain competing integration clauses," D.I. 22 at 10, the Engagement Agreement's integration clause does not support Plaintiff's claims that the agreements must be read separately, given that the Funding Agreement is attached as an exhibit to the Engagement Agreement, and the Funding Agreement defines "Agreement" to mean, "collectively, this Funding Agreement, together with all exhibits, schedules and amendments hereto, including all documents expressly incorporated herein by reference." FA, ¶ 2.3.

> *reasonable* to [Plaintiff], and that this Agreement and the Funding Agreement were the product of arm's length negotiation with [Plaintiff and Susman].

EA at 18. Given this "Client Acknowledgement," the Court agrees with Defendant that "there can be no dispute" that Plaintiff's assent to the Funding Agreement was a condition of Plaintiff's engagement with Susman. D.I. 26 at 5.

Given the above, the Court finds that Plaintiff "was no mere stranger to the Funding Agreement, but instead expressly incorporated it into its Engagement Agreement with Susman and agreed to be bound by it, including the requirement to arbitrate disputes with Longford." *Id.* This matter is wholly distinguishable from *Rieder v. Woods*, 603 S.W.3d 86 (Tex. 2020), where the court refused to read two agreements in concert where the agreements were not attached and made "no reference to each other whatsoever." *Id.* at 95. In this matter, Plaintiff executed an agreement that required Plaintiff to review and accept the terms of the Funding Agreement, which was attached as an exhibit. Thus, *Rieder* is inapposite, and the Court finds that the Funding Agreement and Engagement Agreement were executed as part of the same transaction and constitute a single, unitary instrument.

Accordingly, the Court finds clear and unmistakable evidence that Plaintiff, by executing the Engagement Agreement, assented to the terms of the Funding Agreement, including its requirement to arbitrate with Defendant on the issue of arbitrability.

### 3. *Defendant is a third-party beneficiary to the Engagement Agreement.*

Alternatively, the Court agrees with Defendant that Longwood, "[a]s a third-party beneficiary of the Engagement Agreement, [] is entitled to enforce the Engagement Agreement's arbitration provision." D.I. 18 at 12. Under Texas law, a third party may enforce a contract

11

"when the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party." *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). "In determining whether the parties to a contract intended to benefit a third party, courts look to the entire agreement, giving effect to all of its provisions." *Allen v. W&T Offshore, Inc.*, No. 3:18-CV-00305, 2019 WL 7040441, at *2 (S.D. Tex. Nov. 19, 2019), *report and recommendation adopted*, No. 3:18-CV-00305, 2019 WL 7020204 (S.D. Tex. Dec. 20, 2019). "Although a third party must be more than an incidental beneficiary, *a beneficiary is not required to show that the parties executed the contract solely for its benefit.*" *In re Citgo Petroleum Corp.*, 248 S.W.3d 769, 776 (Tex. App.—Beaumont 2008, pet. denied) (emphasis added). Rather, "a third-party beneficiary may be identified by class or category of persons in the arbitration agreement, all of whom may not be known to the parties at the time of execution." *Allen*, 2019 WL 7040441, at *2.

Plaintiff argues that Defendant is not a third-party beneficiary because "[t]he purpose of the Engagement Agreement was to govern the relationship between Susman (the attorney) and Arigna (the client)." D.I. 22 at 17. Thus, Plaintiff contends that "the Engagement Agreement does not manifest an intent to confer benefits upon Longford; rather, it confers benefits on Susman by providing a mechanism for Susman to satisfy its obligations to Longford using assets belonging to Arigna." *Id.* The Court disagrees.

In seeking to establish the terms of Susman's representation of Plaintiff through litigation and its patent enforcement campaigns, the Engagement Agreement outlined, among other things, the manner in which certain costs and expenses, including Susman's attorneys' fees, would be funded. *See* EA at 7. As the Court noted above, the Engagement Agreement explained that Defendant would pay "costs and expenses related to the pursuit of [Plaintiff's] Claims" in

exchange for compensation "when the matters are resolved." *Id.* Pursuant to the Engagement Agreement, Defendant's compensation would come from any "Proceeds" gained by Plaintiff from its patent enforcement campaigns. *See* EA at 5 (defining "Proceeds" broadly to mean "any and all gross, pre-Tax monetary recovery or the value of any other consideration received, or to be received, by [Plaintiff], . . . as a direct or indirect result of, part of, in connection with, relating to, or arising from" Plaintiff's Claims). To "secure [Defendant's] rights to payment," the Engagement Agreement assigned Defendant "a first-priority security interest in the proceeds recovered" by Plaintiff. EA at 9. Finally, the Engagement Agreement explained that "[t]he . . . compensation terms set forth in this Agreement . . . were negotiated by [Plaintiff], [Susman], and [Defendant]." EA at 6. Because the Engagement Agreement outlined and secured Defendant's right to compensation, and because the agreement recognized Defendant's role in negotiating the terms of this right to compensation under the Engagement Agreement, the Court finds that the Engagement Agreement manifests a clear intent to confer direct benefits upon Defendant.

Plaintiff argues, however, that the Engagement Agreement provided a mechanism for Susman to satisfy *its* obligation to reimburse Defendant. D.I. 22 at 17. The Court disagrees and finds that the unambiguous terms of the Engagement Agreement prove that the obligation to reimburse Defendant belonged to Plaintiff, not Susman. Specifically, the Engagement Agreement holds that "costs, expenses, and fees will be reimbursed **by you to LCF**" and also notes that "**you agree to pay SG and LCF contingent percentages**" as set forth in the agreement. EA at 3 (emphasis added). The term "you" is defined by the Engagement Agreement to mean Plaintiff "Arigna Technology Limited (including any successor or related entity who is the holder of the patent(s) described below ("Client" [])." *Id.* at 1. "SG," on the other hand, is defined to mean Susman. *Id.* Thus, there can be no dispute that the Engagement

13

Agreement, by requiring "you" to reimburse Defendant for costs, expenses, and fees, assigned the obligation to reimburse Defendant to Plaintiff alone.

Given the above, the Court finds that Defendant, as a third-party beneficiary to the Engagement Agreement, can enforce the Engagement Agreement's arbitration provision. Accordingly, Defendant's Motion to Compel Arbitration is **GRANTED**, and this case is stayed pending a decision from an arbitrator on the arbitrability of Plaintiff's claims.

### b. Plaintiff's Motion to Enjoin Arbitration is Moot.

In support of its Motion to Enjoin Arbitration, Plaintiff contends that Defendant should be enjoined from compelling arbitration because, among other things, "Arigna is likely to prevail in showing that Longford cannot enforce the arbitration clauses contained in the Engagement Agreement or Funding Agreement against Arigna. D.I. 22 at 18. However, as the Court finds that Longford can enforce the arbitration clause contained in the Engagement Agreement, Plaintiff's Motion to Enjoin Arbitration is DENIED as moot.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Compel Arbitration and **DENIES** Plaintiff's Motion to Enjoin Arbitration. This matter is stayed pending resolution by an arbitrator on the issue of arbitrability of Plaintiff's claims.

\*\*\*

WHEREFORE, at Wilmington this 5th day of June 2024, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Compel Arbitration (D.I. 17) is GRANTED, and this matter is STAYED pending resolution of the question of arbitrability by an arbitrator; and

2. Plaintiff's Motion to Enjoin Arbitration (D.I. 21) is DENIED.

_____
GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE